**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

IN THE MATTER OF THE APPLICATION )     Case 05-1703-CBS
OF THE UNITED STATES OF AMERICA )     ~~M.B.D.~~ NO.
FOR CRIMINAL COMPLAINTS AND ARREST )
WARRANTS FOR VARIOUS PERSONS AND )
WARRANTS AUTHORIZING THE SEARCH )
AND/OR SEIZURE OF VARIOUS )     **FILED UNDER SEAL**
PREMISES AND ASSETS )

**AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS**

Joao J. Monteiro, a Task Force Agent with the Drug
Enforcement Administration, being duly sworn, deposes and states
that:

1.   I am a Task Force Agent with the Drug Enforcement
Administration ("DEA") and I am currently assigned to DEA's New
England Field Division, with its main office in Boston,
Massachusetts. I am a police officer with the Boston Housing
Authority Police Department and I have been so employed for
approximately nine years; I currently hold the rank of
Investigator/Police Officer. I have been assigned to DEA's
office in Boston for approximately eight years.

2.   During my employment with DEA, I have participated in
numerous investigations relating to the distribution of
controlled substances, including cocaine, crack cocaine, heroin,
and other substances, in violation of the federal anti-drug laws,
including Sections 841 and 846 of Title 21, United States Code.
I have also operated in an undercover capacity on many occasions
and, while working as an undercover agent, I have made over 800

controlled purchases of narcotics. I have also assisted in numerous other investigations in different capacities, such as surveillance, execution of search warrants, execution of arrest warrants, debriefing of cooperating individuals, and other investigative methods. These investigations have resulted in arrests and convictions for violations of state and federal drug laws; seizures of drugs, firearms, and money; and forfeiture of money, vehicles, and real estate.

3. I have received training in the field of narcotics enforcement and investigations from the Massachusetts Criminal Justice Training Council, including an 18-week training program that I completed in August 1995. I have had supplemental training in the recognition and detection of illegal narcotics and the apprehension of narcotics offenders, including a two-week DEA Basic Narcotics School that I completed in 1999.

4. Through my training, education, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly used by persons engaged in the trafficking of illegal drugs. I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs. I am also familiar with the various items used to compound, process, deliver, and serve as containers for cocaine, crack cocaine, heroin, and other controlled substances. Specifically, I am aware that drug

2

traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and that they frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am also familiar with the manner in which drug traffickers use telephones; coded, veiled, or slang-filled telephone conversations; pagers; coded pager messages; and other means to facilitate their illegal activities. I am also familiar with the vernacular or street names for buyers and sellers of drugs and the various methods used by such persons to disguise the subject matters of their conversations and their operations.

        5.    I submit this Affidavit in support of an Application for Criminal Complaints and Arrest Warrants for the following individuals: HUSIE JOYNER, GREG BING, ANTHONY SMITH, DONNELLE JOYNER, GERARD KIMBLE and RALPH HOUSE. I further submit this affidavit in support of Search Warrants authorizing the search of the premises listed herein for evidence of offenses involving the distribution of, and possession with intent to distribute, controlled substances; the possession of controlled substances; and conspiracy and attempts to do the same, in violation of Sections 841(a), 844, and 846 of Title 21, United States Code; and money laundering, in violation of Sections 1956 and 1957 of Title 18, United States Code; and/or the possession of firearms by convicted felons, in violation of Title 18 U.S.C. § 922(g);

3

the premises are:

> a. 175G Centre Street, Apt # 708, Quincy, MA
> (Husie Joyner's primary residence).
>
> b. 175L Centre Street, Apt # 1206, Quincy, MA
> (Donnelle Joyner's residence)
>
> c. 49 Woodruff Way, Mattapan, MA (Husie Joyner's
> mother's residence, where he maintains a bedroom
> and receives mail)
>
> d. 751 Shawmut Avenue, Apt # 715, Roxbury, MA
> (Greg Bing's primary residence).
>
> e. 469 Washington Street, Walpole, MA (Anthony
> Smith's primary residence).
>
> f. 428 Washington Street, 2nd Floor Apartment,
> Dorchester, MA (the primary residence of Jaijuanna
> Harris, Husie Joyner's girlfriend).
>
> g. 77 Ellington Street, 1st Floor Apartment,
> Dorchester, MA (another residence of Donnelle
> Joyner's)
>
> h. 57E Sumner Street, Dorchester, MA (the
> primary residence of Gerard Kimble).

6.    I further make this affidavit in support of seizure
warrants for the following:

> i. A 2005 black Range Rover sport utility
> vehicle bearing license plate RS42DX with vin

4

SALMF11445A189396 registered to Kimberly Douglass,

570 South Main Street, Apt #2, Fall River, MA.

b.   A 2005 gray Acura TL 3.2 sedan bearing

license plate number RS95CE with vin

19UUA66275A031176 and registered to Jaijuanna

Harris, 428 Washington Street, Dorchester, MA.

c.   a 2004 black BMW 645 CSI convertible bearing

New York license plate number CXL8088 and vin

WBAEK73434B320542, registered to Frederick B.

Joyner, 102 Montauk Highway, Westhampton, New

York.

d.   A 2005 Black Bentley Continental bearing

License Plate Number NE3362 with VIN

SCBCR63WX5C02433 and Registered to Patrice F.

Smith, 469 Washington Street, East Walpole.

## Background of the Investigation

7.   In or about September 2004, working with the BPD, I

began an investigation of the drug trafficking activities of

Target Subjects HUSIE A. JOYNER and GREGORY R. BING.   On

September 14, 2004, I interviewed a cooperating source

(hereinafter referred to as the "CS").   The CS stated that s/he

knew from personal knowledge that JOYNER has been selling large

quantities of crack cocaine in Boston for years.   The CS further

stated that the CS had purchased crack cocaine directly from

5

JOYNER on three occasions in the recent past and that, after the last such purchase, JOYNER had instructed the CS to go through BING and/or an associate named Ralph House for future purchases of crack cocaine.

8.    From September 2004 to January 2005, the CS made two controlled purchases of powder and four purchases of crack cocaine from BING.  JOYNER was directly involved in two of the purchases.  Five of the deals were for 62 grams each and one was for 125 grams.  In connection with these controlled purchases, the CS was searched both before and after the deals with negative results and the CS was provided with a device that enabled the conversations to be recorded.  In addition, the deals were was surveilled by several law enforcement agents.  This protocol was followed in all subsequent controlled purchases.  Several of the deals took place around 751 Shawmut Avenue where BING resides. In one, the CS and I drove to the agreed-upon location, where I observed JOYNER and BING arrive together in a gray Lexus sport utility vehicle.  I then observed BING enter the building at 735 Shawmut Avenue (which is connected to 751 Shawmut Avenue) while the CS walked over to the Lexus and engaged JOYNER in a conversation.  Shortly thereafter, BING exited the building and walked with the CS to a parked green Plymouth Voyager mini-van.[1]

---

[1]This vehicle was registered to Mysti Philyaw, also known as Mysti Palmer.  Palmer is BING's girlfriend and resides with him at 751 Shawmut Avenue, Apt. #715, in Roxbury.

6

The CS later told me that after both entered the vehicle, BING produced a plastic bag of powder cocaine (laboratory analysis confirmed that the substance was cocaine with a net weight 60.6 grams and 86% purity) and sold it to the CS for $1,850 in cash. During the deals, BING and JOYNER were also careful to avoid law enforcement by switching locations, conducting counter-surveillance, and other methods. At one point, the CS was also questioned by them about whether I was a "fed" (i.e., an undercover DEA agent) as I accompanied him to early deals. After one deal was cancelled, I was present when the CS called and had a consensually-recorded conversation with BING. The CS stated that the CS would no longer do business with me as he did not want to lose BING and JOYNER as suppliers. BING stated that he had to be careful and he told the CS to call him when the CS was ready (to purchase more crack cocaine).

9.     During the time of his cooperation with DEA and ATF, the CS had pending cases in at least two state courts in Massachusetts involving serious charges. The CS did not seek assistance from the government in connection with those charges and expressed his belief to law enforcement officers that the cases would be dismissed on their own merits. The CS cooperated solely in exchange for being paid and he was paid $3550 in exchange for his activities as summarized above. The CS has an extensive criminal history and has previously provided assistance

7

to another federal law enforcement agency. However, the
information provided by the CS regarding JOYNER and BING has been
proven reliable, and has been independently corroborated to the
extent possible by independent investigation, as summarized
above. Moreover, I am aware that the CS has provided reliable
information for over the past ten years to ATF agents resulting
in the execution of numerous search warrants in which firearms,
drugs, and money have been seized. After the January controlled
purchase, the CS arranged without authorization a drug
transaction for another individual with JOYNER and/or BING. He
was subsequently deactivated by DEA after he told what happened
and not available to be used in the investigation. Following his
deactivation, and during the course of the wire tap
investigation, the CS was intercepted more than once arranging,
again without authorization, to purchase crack cocaine from the
organization.

**Summary of Wire Tap Investigation and What It Revealed About the
Operation of Joyner's Drug Organization**

10. This year, the government conducted wire intercepts
over telephones belonging to JOYNER (JTT #1 and #3) and BING (BTT
#2 and #4). The wire tap investigation has resulted in the
interception of thousands of telephone calls involving HUSIE
JOYNER, BING, and the other members of their drug organization
and their customers. I have listened to hundreds of intercepted

8

calls, reviewed the line sheets (line sheets are contemporaneous written summaries prepared by law enforcement personnel responsible for monitoring the interceptions) of most pertinent calls, and reviewed the reports of law enforcement agents and officers conducting surveillance and other actions in support of the investigation. In addition, I have analyzed these sources of information and conducted and requested independent additional investigation in support of the criminal complaint and arrest warrants and search and seizure warrants requested below.

11. On the basis of these sources, I can state that the wire tap investigation has revealed the following: 1) that HUSIE JOYNER runs a large scale, wholesale drug organization which sells crack and powder cocaine to various customers in and around Boston, MA; 2) that HUSIE JOYNER's organization includes among its core members GREG BING, DONNELLE JOYNER, ANTHONY SMITH, and RALPH HOUSE; 3) that HUSIE JOYNER's organization has more than two dozen customers who purchase powder and crack cocaine for resale in amounts including 62 grams, 125 grams and greater quantities; on at least two occasions following meetings with BING, officers stopped individuals linked to a deal by BING and recovered powder or crack cocaine. In another instance a customer was stopped but later told BING that the police didn't find it because of where he hid it; 4) that members of the organization and its customers use personal and rental motor

9

vehicles to facilitate their drug transactions; and 5) that the organization generates substantial illegal proceeds that members of the organization use to purchase real estate and expensive motor vehicles, jewelry, and other personal property. Such property is frequently concealed in the names of nominal or straw owners, often girlfriends or relatives, to conceal the true ownership and to disguise the source of the proceeds used to purchase such property. Summaries of a sample of calls follow.

12. On April 20 at 6:00 pm, BING used BTT #2 (Call 247) to call HUSIE JOYNER on JTT #3. BING tells HUSIE that he owes Big Homey (Smith) 3 dollars for those two pair of sneakers. HUSIE asks who's Big Homey? BING replies he ain't gonna say his name on the phone and explains that he is with us, the two pair of Jordans, the black and white ones. Smith gets on the phone and HUSIE tells him that, 'you still owe me 7 pairs from the last thing.' Later he refers to it as 7 grand. Then HUSIE says '15 f***ing grand man.' Smith asks for what? HUSIE explains that he forgets the seven and 15 that Donnell just lost. Smith says that he 'ain't got nothing to do with what Donnell lost. . . Donnell did that wrong.' HUSIE says he was only f***ing with him, 'you owe me seven Ant, you still owe me seven.' Smith asks for what and HUSIE says, 'member when you messed up sh*t, you called your man, it was off seven?' Smith replies 'you said that sh*t ain't nothing man. . . you talking about the two pieces that were in

10

two halves when you opened the thing?  HUSIE says yeah, it may
have been more, but we agreed to a seven.  Your man said yeah I
think he had that.  F***in you throw in 45?'  Smith says yeah.
HUSIE says and 'tell BING he don't call me and tell me what I owe
you.  When I get back we chat.'  Smith states that he gave BING
short money, 'I gave him 5 dollars for a thing.  HUSIE says you
can't do that, 'me and you will handle whatever when I get back,
dog.'  Smith says he will give him the 300, alright, shut up man.
I believe that BING, HUSIE, and Smith were discussing amounts of
money from the sale of wholesale amounts of crack and powder
cocaine.  This call also reflects how HUSIE controls the
operation and how HUSIE, BING, Smith, and Donnelle Joyner all
work together.

13.  At 6:51 pm, the same day, BING calls Anthony Smith
using BTT #2 (Call 262) and asks if Donnelle is there and Smith
says yes and Donnelle gets on the phone.  BING says he just woke
up and Donnelle says that BING is on vacation right now cause "P"
[referring to HUSIE, also known as Poopie, or "P"] ain't around
[he is in Florida at the time] and you don't have to stay out
until 4 am.  Donnell says BING should get his rest because that
n***er is going to work you like a mule when he comes back.  This
call further reflects how HUSIE runs the organization.

14.  On April 22, 2005 at 8:35 pm, BING uses BTT #2 (Call
599) to call HUSIE on JTT #3 and they have a series of drug

11

related calls. HUSIE asks where Donnell is and BING says he is right here in BING's crib. HUSIE says to tell Donnell 'if he gonna do his up give me all the rock . . . is it powdery or is it rocky?' BING complains he has the sh*t in 250s but all sealed up like he is selling herb or something. HUSIE says one of them is 4 grams short. BING says it is all rocky and HUSIE says, 'all rock, perfect, cause you know Ronnie [referring to a customer] and all them only like rock.' BING says, 'no, it ain't rocky I said.' HUSIE says to make it rocky and make it 250 and 125 rocky. BING says something is not right about this thing and HUSIE says don't let nobody touch sh*t. BING explains the zip lock bags, its saying 252. BING tells Donnell not to touch it. HUSIE again says not to touch nothing and not to put nothing in nothing and to explain what BING is talking about. BING says hold on a minute, let me see how much the bag weighs. The bag weighs 3 'grizzies.' BING says one of them weighs 244 on the dot. HUSIE says not to take them out of the bags. BING says he knows what he is doing. BING says it is 992 all together. HUSIE says not to open anything, he is going to call Ant (Smith) right now. BING says he weighed it on HUSIE's scale, the big one, not Donnell's. BING concludes its 8 grams short with the bag. Later (BTT #2 Call 600) BING, HUSIE, and Donnell, argue more about whether it is with or without the bag and the total weight. Donnell states, 'we put the bizzy on the scizz, we subtracted bag

of the scizzy and then put them up there, all together there's
992, that's without the bag.' HUSIE says he will call Ant
[Smith] and not to touch anything. During this call, BING and
Donnelle were describing to HUSIE the weighing and packaging of
amounts of crack and powder cocaine in quantities for sale of 125
and 250 grams and how some of the packages did not weigh as much
as they should. HUSIE insisted that they leave everything as it
came so that Smith could come over.

15. On April 23, at 5:04 pm, BING receives a call on the
BTT #2 from HUSIE on JTT #3. HUSIE asks BING 'how much was hard
left?' BING replies, a rizzy. HUSIE says huh, and BING says, 'a
rope.' [Usually a term for an ounce]. HUSIE asks, 'after you see
Ronnie, how much hard is left.' BING says, 'I just told you, a
rope.' HUSIE says, 'a rope? Hmmmm. And you're seeing Ronnie,
um.' BING says 'who else, what else?' HUSIE says, 'just give it
to Ronnie, he's good for it because you get scared anyway. If I
get a play, I'll make somebody come out. . . but don't sell no
weight out of yours, out of your shit.' BING says he will be
ready to go, probably later on or something with, you know, with
Iggy or something, he called me yesterday. HUSIE asks if we can
get House, 'I ain't worried if it came down to it.' HUSIE tells
BING not to put nothing together. BING says he only got two new
things though from yesterday. HUSIE says don't add what Ant
[Anthony Smith] gave yesterday. BING says no, that is something

13

different.  BING says he is on his way outside cause n\*\*\*er's on

a side street.  HUSIE asks if BING called Donnelle yet to make

sure he is over there.  BING says he is about to call him right

now.

16.  Dozens of calls have been intercepted of conversations

between Ralph House and BING and House and HUSIE.  During many of

these calls, House arranges to meet HUSIE or BING in order to

obtain from them powder or crack cocaine to sell to customers or

to deliver money received from customers to them.  For example,

on April 22 at 9:22 pm, BING receives a call on BTT #2 (Call 613)

from House who arranges to meet BING near BING's Shawmut Avenue

apartment.  House says he is gonna grab 62 cents.  BING says,

'oh, a dubie, alright.'  The terms "62 cents" and "dubie" both

refer to 62 grams of crack or powder cocaine.  IN another

conversation on May 2, BING tells HUSIE that House just called

for a d-dubie.  HUSIE says, 'Yah, I, I got that at the house,

tell him to come pick you up real quick and meet me on Norfolk.'

I know that Norfolk is near Washington Street in Dorchester and

not far from Woodruff Way in Mattapan.

17.  In a series of calls intercepted on May 5, House orders

a 125 (grams) when BING and HUSIE get back from downtown.  At

18:32:03 (Call 2818), BING tells House to meet down the way

(meaning Shawmut Avenue).  House says to make it a deuce.  At

19:08:38 (Call 2831) House tells BING he is 'ay my crib.'  BING

14

says he thought House was coming through and he is standing outside waiting. House says he is coming right now. Several additional calls follow about meeting up. At 20:52:59 (Call 2861), BING asks House, 'did you get home safe from work?' House says yeah and HUSIE gets on the phone and says it is hot down the way and that is why they are making sure. House asks why he didn't get the 125 like he asked and complains that BING just didn't want to go back to his crib (his residence). HUSIE asks if he had the dust (money) on him and House says he did. House says he wants it right now. HUSIE says, 'Hold on we gonna go back down the house in Quincy putting this bag in the house and I'll be ready to come back out.' This refers to HUSIE's residence in Quincy.

18. The operation of the organization has continued until the present. In the evening of July 21, 2005, we intercepted a call in which Smith indicated that JOYNER had discovered two GPS tracking devices installed in his Range Rover automobile. As a consequence of this, and due to the extreme suspicion reflected in many of the intercepted calls, including the targets making surveillance, conducting extreme counter-surveillance, discussing possible snitches, and wondering about stops that were made from information gleaned from the wire tap, we believe the investigation has been compromised. Due to other conversations, we further believe that JOYNER, BING, SMITH and DONNELLE JOYNER,

would attempt to flee and destroy evidence. We have therefore taken steps to find and arrest these individuals and secure the locations to be searched.

19. In addition, several calls and surveillance observations show that Gerard Kimble was a drug associate of JOYNER's and an occasional customer. For example, on May 11, during a series of intercepted calls, Kimble asks HUSIE 'if we can get it together and have a talk.' They agree to meet at Kimble's house in half an hour. HUSIE asks, 'should I just bring something around the neighborhood?' Kimble says yes. I interpret this as meaning that JOYNER was going to bring a quantity of drugs to Kimble's residence. At 20:39:13 (Call 13), HUSIE gets a call from Kimble from another number 617-785-3070 and says 'I want to spend all day with you.' HUSIE replies alright and Kimble says he will call in half an hour. HUSIE says tell them to make it quick because he is ready to roll. At 21:52:39, Kimble uses another number 774 259-8174 (Call 21) and asks, 'Are you going to talk to me?' HUSIE says yes and he will be around 15 minutes. At 22:24:37 (Call 25), HUSIE calls Kimble at 617 590-4561 (a phone subscribed by Kimble at 57E Sumner Street) and tells Kimble to 'get ready to come outside.' During this time, surveillance officers SA Crowley and Det. Freeman observed HUSIE JOYNER's Acura traveling on I-93 North from Quincy to Dorchester. At 22:32 Det. Teehan observed the Acura at the corner of Annabel

16

and Sumner Streets. Officers were unable to get into position at 57 Sumner Street, however, and no meeting was observed. A few minutes later, GPS data showed the Acura was back on I-93 South and back at 175 Centre Street by 22:48. At 22:56:37 (Call 28), HUSIE calls Kimble back saying, 'I was just making sure that it's a straight um "G" on a Bizall for you that's all I'm doing.' Kimble says alright and HUSIE says he'll be right there. At 23:13:00 (Call 31), Kimble called back and said he was 5 minutes away. During this time, Det Rentas observed the Acura in the area of Sumner Street followed by a dark colored sedan bearing MA Reg. 42WS31 (later determined to be driven by Greg Bing). The two vehicles squared the block and when they returned, Det. Teehan observed HUSIE JOYNER exit the Acura, walk up to the sedan and make an exchange with someone through the window. JOYNER then entered 57E Sumner Street at 23:39 as the driver of the sedan stayed in the vehicle. JOYNER exited 57E Sumner Street at 23:45 and got back into the Acura. At this point, black male about 5'7" and 160-165 lbs exited 57E Sumner Street and had a short conversation with JOYNER. This individual then re-entered 57 Sumner Street as JOYNER pulled away. The other vehicle followed. During this time, the base intercepted a conversation between JOYNER and BING in which JOYNER said he did not want to go down Columbia Road. After another deal, officers followed both vehicles until they got on I-93 South. A short time later,

17

GPS confirmed that the Acura was at 175 Centre Street.

20. On June 26, during a call on JTT #4 (Call 610) HUSIE tells Kimble he has good stuff ('its real good') and Kimble wants some (I'm trying to talk to you, when can you come?'). Later, on JTT #4 Call 619, HUSIE tells Kimble he is going to stop by real quick. Shortly after this call, surveillance agents and the GPS show the Acura moving from 48 Woodruff Way. At 22:48 Call 620, JOYNER tells Kimble to come outside. During this call, surveillance agent Adolfo Brito observed JOYNER arrive at Sumner Street and saw JOYNER meet with Kimble (who he recognized) on the front steps of 57E Sumner Street, a townhouse where Kimble resides. After a short time, surveillance officers observed Kimble and Joyner enter 57E Sumner Street. Moments later, JOYNER exited by himself, entered the Acura and left the area.

## Search Warrants

21. **a) 175G, Centre Street, Apt. # 708, Quincy, MA.** Based on physical surveillance, the premises at 175G Centre Street, Apt # 708, Quincy, MA is described as a single residence apartment within a large apartment complex.

22. Based on the results of the wire interceptions and physical surveillance, I know that this premises is the residence of Husie Joyner. For example, at approximately 22:02:22 on April 25, Husie Joyner used the Bing Target Telephone to call a takeout restaurant in Quincy and requested to have food delivered to him

18

at 175G, Centre Street, Apt. # 708.

23. The wire intercepts show that JOYNER uses his Quincy apartment to store drugs and money. He has frequently and more recently directed customers to drive from their Boston residences to Quincy in order to complete drug transactions near his residence. For example, on June 26, 2005, HUSIE JOYNER had a series of conversations with one of his drug customers directing him to his condominium complex in Quincy. The customer stayed on the line until he saw JOYNER outside, presumably to complete a drug deal.

24. As recently as July 12, 2005, JOYNER arranged and conducted a drug deal in Quincy for 125 grams of cocaine. JOYNER came from his residence in order to conduct the deal from his Acura on the streets of Quincy.

25. During the wire tap investigation, JOYNER has frequently engaged in conversations with BING, Donnelle Joyner and Anthony Smith about the division among them of substantial sums of money, in the tens of thousands of dollars. In light of my training and experience and the wire intercepts, I believe that HUSIE JOYNER stores substantial cash proceeds at his residence and that he must maintain records of the substantial quantity of cocaine and crack and money flowing through his organization. Finally, in several conversations, JOYNER indicated that he had a computer. On some occasions he has sent

19

text messages to individuals from his telephones. I believe it
is therefore likely that he uses his computer in connection with
his drug business and that records, notes, and documents
associated with his drug business and his many assets will be
contained within his computer.

26. The wire intercepts have also shown that JOYNER has no
legitimate employment yet he has substantial assets, including
vehicles, real property, and potential bank accounts in the name
of others. The intercepts reveals that he has at least four
vehicles in the names of others which really belong to him,
including an Acura, a Range Rover, and two BMWs. He has also
spoken to electricians and contractors about two properties, one
in Brockton and one in Boston, that he has apparently purchased
but are not in his name. He has discussed his interest in a
business, possibly in New York, that also is not in his name. He
has also discussed bank accounts, some in his name and some in
the names of others. Based on my training and experience, I
believe he will maintain documents and records concerning these
assets, including records reflecting insurance, ownership,
payments, and upkeep of these assets.

27. **b) 175L Centre Street, Apt # 1206, Quincy, MA.** This
is the residence of Donnelle Joyner. He has a 2002 black BMW
M3CIC convertible bearing license number 9355MN and vin
WBSBR93402EX24156 and registered to him at that address.

20

Although he also maintains a residence at 77 Ellington Street in Boston, I believe that he feels the Quincy address is more secure. During some intercepted conversations, Donnelle stated he was going to take a shower in "Q" referring to Quincy. The apartment is located in the same general complex that HUSIE JOYNER maintains his apartment and is a nice group of apartments likely to be rather expensive. I do not believe Donnelle Joyner would maintain this apartment unless he needed it to secure things such as drugs, proceeds, records, jewelry, or firearms in connection with his drug trafficking activity. During some intercepted conversations, members of the group made mention of property Donnelle JOYNER may have in Phildelphia. The interceptions also revealed that Donnelle Joyner was making deliveries to his own customers often without having to hook up with JOYNER or BING. Thus, I believe that there is additional probable cause to believe that drugs, money, and records of drug transactions and assets will be located within his residence.

28. **c) 49 Woodruff Way, Mattapan, MA.** Is the residence of HUSIE JOYNER's mother. During several intercepted calls, JOYNER made clear that he maintained a bedroom there and that no one was permitted to go inside. He also indicated that he receives mail there, and thus there may be records and other documents concerning his assets. Moreover, many of the deals took place around that location and some of the deals involved JOYNER

21

leaving from 49 Woodruff Way to meet a customer out on the
street.  As a consequence, I believe there is probable cause to
believe that drugs, cash, and records of drug transactions,
customers, and assets will be found there.

     29.  **751 Shawmut Avenue, Apt # 715, Roxbury, MA.**  Is the
primary residence of Greg Bing, where he lives with Mysti Palmer,
his girlfriend.  BING arranged many of the deals from his
residence and came from the residence to meet customers out on
the streets nearby to provide them crack or powder cocaine. The
interceptions reflect that some of the customers were actually
buzzed into BING's apartment building to conduct sales. During a
call in April, HUSIE told BING that Mysti told JOYNER that a
bunch of people were cooking (crack) in the apartment. During a
series of intercepted calls on May 12, 2005, HUSIE JOYNER  was
intercepted in calls talking with Donnelle and his girlfriend to
take his drugs out of the apartment because the police were
responding there to a domestic dispute between BING and Mysti
Palmer.  HUSIE also says that there is a gun (burner) at BING's
other house.  At one point Donnelle tells Husie that they cannot
find the bag with Husie's money in it. Husie says that there is a
bag that has 6000 dollars in it. Donnelle says he will call him
when they find it.  Later, HUSIE tells BING that he wants all of
his shit out of there and for Jaijuanna and Mysti to get it out.

     30.  On May 16, 2005, at 3:35 am, BING had a conversation

22

with HUSIE JOYNER in which they were discussing detection by law enforcement and how a particular former Boston Police detective whose step-daughter is Mysti Palmer, BING's girlfriend, who he lives with at the BING Target apartment. JOYNER worries that the former detective knows about their activities in and around the Shawmut Avenue apartment could provide that information to friends on the police force. JOYNER tells BING if they (the police) search your house, even though they can't right now, she (Mysti Palmer) will get locked up for this shit.

31. During several calls with JOYNER, BING assured him that he had everything (referring to drugs and money packages) written down and that he had the ones that JOYNER signed and the ones that Ant (Anthony Smith) signed. I believe BING was calling from the Shawmut apartment during many of these calls. I believe this means that the organization kept extensive records and that such records would be kept in a safe place. During the investigation, there did not appear to be another location other than Shawmut Avenue that BING would keep such important records.

32. **469 Washington Street, Walpole, MA.** Is a single family home that is the residence of Anthony Smith, his wife Patrice, and their children. Based on wire intercepts and physical surveillance, I know that Anthony Smith resides at 469 Washington Street. I also believe that Smith keeps items at this residence used in his drug trafficking, including but not limited to

23

cocaine, crack, drug proceeds, a counting machine.

    33.  For example, on May 8, HUSIE called Smith at
508-660-9138 the telephone at 469 Washington Street.  HUSIE and
Smith engaged in the following conversation:

Husie:    When you get time right.

Smith:    Ah, ah.

Husie:    Like when you get time you look around ???? just look
        for a stack of all one hundred dollar bills in a 300,
        3 dollar stack.

Smith:    Alright.

    (BOTH talk at the same time)

Smith:    ???? I sent mostly everything but I will look at mine

Husie:    But ask your man, ask your man just ask your man to
        look.

Smith:    Alright, well how many.

Husie:    It should be three dollars,????

Smith:    Hold on, hold on man hello.

Husie:    Bing swears he didn't touch that shit man

Smith:    What that other shit.

Husie:    Yeah.

Smith:    I'll ask, I swear though that I know you know how I
        know wasn't.

Husie:    Hah.

Smith:    Everything I went through, I went through with the

24

machine except that last batch you gave me.

Husie:    That sounds good, just ask.

Smith:    I'll look, you know how you put em you normally flip em

Husie:    I do em like that you know what I am saying ????, I do

the rest like that ???? it makes no difference.

(SOUND OF NEXTEL PHONE BEING TURNED ON IN THE BACK GROUND)

Smith:    Hold on I going to to do it right now on the phone

(SOUND OF NEXTEL PHONE BEING TURNED ON IN THE BACK ROUND)

Smith:    Let me call this.

(SOUND OF NEXTEL DIRECT CONNECT BUSY SOUND IN BACK GROUND)

(MORE SOUND OF NEXTEL Direct connect BUSY SOUND)

Smith:    I'm a ask him.

Smith:    I know, I'm not going to say anything to him. I will go

through mine.

Husie:    Just look that's all I'm saying ???? I don't want to

get an attitude with you but he like I swear on my

kids. I was like yo,???.

Smith:    I swear on everything I love nigger you know I wouldn't

lie about no mother fucking and then I checked going

over it, because that particular one I went over it 3

times.

Husie:    ??????? already done or whatever.

Smith:    Right.

Husie:    ?? ask the dude and shit man.

25

Smith:    I'm a ask him.

Husie:    Alright I'll holler at you.

Smith:    Okay.

During this call, HUSIE asked Smith to look around for a stack of money, all hundreds in a 300, 3 dollar stack. I believe HUSIE was referring to a stack of currency in the total amount of $3,000. Smith said he would look around but he sent everything. Smith also said everything 'went through with the machine except that last batch you gave me.' I believe that Smith and HUSIE were talking about the proceeds of their drug operation and how Smith counted the money with a counting machine. During another call, Smith was discussing money with JOYNER and he was using a counting machine to count the money. I could hear the machine operating and Smith was describing its operation. Moreover, these and other calls reflect that the Walpole residence is used to store money and that Smith then sends it out. Therefore, the Walpole residence is likely to have additional records of the proceeds of the organization, including where they are sent, and a division of them. In addition, several calls reflected that Smith was engaged in receiving shipments of drugs and making deliveries to other members and to customers. Thus, I believe that there is probable cause to believe that cocaine and cocaine base will be found there.

34.   **428 Washington Street, 2nd Floor Apartment, Dorchester,**

**MA** HUSIE Joyner's girlfriend is Jaijuanna Harris, who resides at 428 Washington Street, Dorchester, MA. Although the telephone service for that address, 617-825-2929, is subscribed to by a 'P. Munyu,' I have been unable to find a person by that name in any law enforcement or other frequently consulted commercial databases. Moreover, the wire intercepts show that Jaijuanna Harris is the primary user of the telephone when this number has been intercepted. In addition, when HUSIE Joyner and Harris returned from Florida on April 25, 2005, Harris found that the apartment had been broken into and called HUSIE to discuss it. During the conversations, both spoke as if Harris and HUSIE were the people who possessed the premises.

35.   In addition, numerous deals were set up in the vicinity of Harris's apartment and HUSIE JOYNER frequently parked his cars nearby.  In one intercepted call, Harris told JOYNER that police were nearby the apartment.  HUSIE and BING later discussed police being out there on Washington Street and/or in the hood. HUSIE says they got hi-tech shit and it could be the feds.  HUSIE says, 'that gives me a reason for going outta town on that shit man.' HUSIE asks BING to pick up BING's two bags and BING says he will handle it.

36.   Based on the wire intercepts, I also believe that HUSIE stashes items relating to his drug business at that location with Harris's knowledge.  For example, when Harris called HUSIE after

27

the break in, HUSIE asks her about something in the closet.
Harris says it is not there.  HUSIE asks if the money is there
and Harris says nope.  HUSIE then asks is the box gone too?
Harris replies, yeah.  HUSIE then tells her before you call any
police, look around your house real good for it.  Later Harris
says she found an unnamed item HUSIE was inquiring about and
HUSIE instructed her to put it in her pocketbook real quick.
After the call, HUSIE called Donnelle Joyner on BING's phone and
and told him they broke into Jaijuanna's house and 'stole that
thing.' In another call with Harris on May 5, HUSIE instructed
her not to let the dogs in a certain room because he had some
money on the couch.

     37.  **75 Ellington Street, 1st Floor Apartment, Dorchester,
MA** is where Donnelle Joyner resides with his girlfriend.  During
the course of the investigation, HUSIE JOYNER and GREG BING
picked up Donnelle at this location on numerous occasions.  In
addition, following his arrest this morning, Greg Bing stated to
law enforcement that Donnelle Joyner has two guns.  Donnelle
Joyner was arrested at this location this morning.  I believe
that Donnelle is likely to have at least one of the guns at this
location as it appears to be where he spends most of his time and
would be in greatest need of whatever protection he felt a
firearm might afford him.  Following Donnelle Joyner's arrest
upon his arrival at 75 Ellington Street this morning, Joy Neely,

28

Donnelle's girlfriend and mother one his child, stated to police officers that Donnelle Joyner stays at the 75 Ellington Street apartment on a regular basis even though he is not on the lease. She also said that he maintains a second apartment in Quincy.

38. **57E Sumner Street, Dorchester**, the investigation and records show that this townhouse is where Gerard Kimble resides. Based on the transactions described above, I believe there is probable cause that cocaine, cocaine base, proceeds, records of drug transactions, telephone logs, scales and packaging equipment will be found within the premise.

39. In addition, the wire investigation has revealed that BING, HUSIE JOYNER, Smith, and Donnelle Joyner use scales to weigh and package the cocaine and crack they sell. For example, in the conversation previously set forth from April 22, BING says he weighed it on HUSIE's scale, the big one, not Donnell's. BING concludes its 8 grams short with the bag. In another call, BING discussed buying a scale with an associate. Moreover, all four have engaged in conversations in which they talk about discrepancies among each other or with customers about being short or other weight issues. Based on my training and experience, the ability to carefully weigh and package crack and cocaine is critical to the success of a drug operation. I believe, based on the foregoing, that each of these locations will have scales and packaging materials.

29

40. Moreover, based on my training and experience, I know that drug dealers frequently carry or stash firearm and ammunition in secure locations such as their residence. Firearms are tools of the drug trade, especially in sections of Boston where these individuals operate, where rivals or robbers can pose great risk. Moreover, given the substantial assets generated by the organization, they had a lot to protect and attracted attention in light of their expensive vehicles and lifestyle.

41. Based on my training and experience, I know that wholesale cocaine and crack traffickers maintain certain necessary equipment and records, typically at their residence or on their person. This equipment includes beepers, cell phones, scales, baggies, and cutting instruments. The targets of this investigation rely heavily on communication as well as accurate scales. In addition, traffickers frequently have documents or other items reflecting indicia of ownership of the items within the residence, such as receipts, personal correspondence, and mail; and documents or other items relating, reflecting, or pertaining to their friends and associates, including, but not limited to: beeper numbers, photographs, address books, notes, ledgers, and other documents depicting or reflecting past transactions; photographs of associates with drugs, guns, motor vehicles.

**Seizure Warrants**

30

42.   The wire tap investigation has revealed that HUSIE JOYNER, ANTHONY SMITH, GREG BING, and DONNELLE JOYNER earn substantial proceeds from their drug trafficking business and use those proceeds to maintain their lifestyles and to purchase real estate, expensive motor vehicles, and expensive jewelry.

43.   The wire tap investigation has revealed that HUSIE JOYNER owns at least four expensive motor vehicles: a Range Rover, an Acura RL, and two BMW 645 CSIs; that Anthony Smith owns at least three motor vehicles: a Bentley, a Volkswagen Passat, and a Toyota Sienna; and that Donnelle Joyner owns at least one expensive car: a BMW M3CIC.

44.   **a) Husie Joyner's Range Rover.** Based on my review of RMV records, I know that a 2005 black Range Rover sport utility vehicle bearing license plate RS42DX with vin SALMF11445A189396 is registered to Kimberly Douglass, 570 South Main Street, Apt #2, Fall River, MA.  Kimberly Douglass was also the registered owner of the Lexus used by HUSIE JOYNER during the controlled purchase of cocaine on September 24, 2004 and I observed him in the Lexus frequently thereafter.  At some point after not seeing the Lexus for a period of time, I ran the plate and determined that it was cancelled on March 7, 2005.  I reviewed the RMV records for Kimberly Douglass and learned that Kimberly Douglass had registered the Range Rover on March 7, the same date the Lexus was cancelled.

31

45.   During the course of the wire tap investigation, numerous calls have been intercepted showing that HUSIE JOYNER is the true owner of the Range Rover, that he has used the vehicle in his drug trafficking activities, and that it was purchased with drug proceeds.  For example, on April 21, 2005, JOYNER received a message on JTT #1 from Walter Whitman of Bentley Long Island, New York asking whether he is still interested in trading the 'Rover' for a Bentley GT.  Moreover, at 11:19 on June 11, HUSIE JOYNER used JTT #1 to call Anthony Smith.  Among other things, JOYNER said that he was in the Range Rover with Elijah, who was very excited to see the Range Rover.

46.   On May 5, at approximately 11:09 pm, HUSIE JOYNER used JTT #1 to call Anthony Smith to discuss money that was missing after JOYNER, Smith, and BING had been together and handling stacks with thousands of dollars.  At one point, HUSIE JOYNER explained how BING brought the money upstairs to JOYNER's room and Smith asked, 'you don't think it's in the Range?'  JOYNER replied he didn't know if he dropped it in the Range but he would go back and look in it.  Shortly after, HUSIE JOYNER again used JTT #1 to call BING and asked him about when the things was missing, have we drove that car since then?  BING said no it was right where he left it.  HUSIE JOYNER said he was going to go look in it.

47.   In addition, based on wire intercepts and other

information, I believe that Kimberly Douglas is the mother of one of HUSIE JOYNER's daughters and that she attends college. She appears to act as a straw owner or subscriber in other instances for HUSIE JOYNER. For example although she resides at 48 Adams Street, Roxbury (she has telephone service subscribed to her at that address and has stated that is her address in intercepted conversations), the electrical utility at JOYNER's apartment at 175G Centre Street, Apt # 708 in Quincy is subscribed and billed in Douglas' name. In addition, on June 11 at 11:35 pm, HUSIE JOYNER called Douglas and asked that she use her credit card to pay for his AOL bill of 19.95. Douglas gave JOYNER her credit card number. Moreover, on May 15 at 5:37 pm, Douglas called JTT #3 from a telephone subscribed to 48 Adams Street and spoke to JOYNER. She told him the insurance was $991. JOYNER asked why it was so high and Douglas said it was because you traded the car, now it costs more money. I believe that Douglas was informing JOYNER of the bill because the car really belonged to him and he would be paying the bill.

48. **b) HUSIE JOYNER's Acura TL 3.2.** Based on RMV records, I know that a 2005 gray Acura TL 3.2 sedan bearing license plate number RS95CE with vin 19UUA66275A031176 is registered to Jaijuanna Harris, 428 Washington Street, Dorchester, MA. Based on wire intercepts and surveillance, I know that the true owner of this vehicle is HUSIE JOYNER, that it has been used by BING to

33

conduct drug transactions, and that Jaijuanna Harris is JOYNER's girlfriend and has the car registered in her name but does not use it. BING used to do deals on wire seen by surveillance agents. BING sometimes also spoke in intercepted conversations of being in the charcoal after guys got stopped. This is a reference to the color of the Acura and the fact that after certain transactions with BING, some customers were stopped by police. In addition, calls from Joyner in April were intercepted while he was in Florida in which he instructed BING to get the Acura serviced.

49. Based on the wire intercepts and other investigation, I know that HUSIE JOYNER owns **a 2004 BMW 645CI CONVERTIBLE BEARING NEW YORK LICENSE PLATE NUMBER CXL8088 WITH VIN WBAEK73434B320542 AND REGISTERED TO FREDERICK B. JOYNER, 102 MONTAUK HWY, WESTHAMPTON, NY.** This vehicle was observed by law enforcement agents at a detail shop in Norwood and has been discussed by JOYNER with Frederick Joyner, who told HUSIE he wanted to get it out of his name. Frederick lives in New York yet the car is in Massachusetts and HUSIE has stated that it is his. During an intercepted call on June 22 at 12:45:20 Smith asks HUSIE how much he spent on the tires for his 645. HUSIE replies $7,500 for wheels and rims. As HUSIE JOYNER has no legitimate source of income, and in light of the nominee registration, I believe there is probable cause to believe that this vehicle represents

34

proceeds of JOYNER's drug activity.

50.   **A 2005 BLACK BENTLEY CONTINENTAL BEARING LICENSE PLATE NUMBER NE3362 WITH VIN SCBCR63WX5C02433 AND REGISTERED TO PATRICE F. SMITH, 469 WASHINGTON STREET, EAST WALPOLE.**   Based on RMV records, this car was purchased from Bentley Providence, 1515 Bald Hill Road, Warwick, RI on or about June 24, 2005 for a total sales price of $165,000.   The listed purchaser Patrice Smith received a trade in allowance of $117,000 for two vehicles, a 2006 Mercedes CLS 500C (less $17,907 lien on Mercedes) and a 2003 Range Rover (less $5687 lien on Rover).   Of the $93,404 due, she put down $5,000 in cash and financed $69,176 with JP Morgan Chase Bank, N.A. PO Box 5210, New Hyde Park, NY 11042.

51.   The Range Rover was purchased by Anthony W. Smith of 340 High Street Randolph on or about March 7, 2003 from Off Road Motor Sports LP of 247 Newbury Street, Peabody, MA 01960.   The total sales price was $71,965 and he received a trade in allowance of $39,000 for a 2002 Cadillac Escalade.   He put down $8,500 and financed $35,679 with Chase Manhattan Bank USA, 60 payments of $594.

52.   The 2006 Mercedes CLS 500 was purchased by Patrice Smith on or about January 29, 2005 from Foreign Motors West, 253 North Main Street, Natick, MA  01760.   The purchase price was $76705 and she received a trade in allowance for the BMW CSI (see next) of $58,000, leaving a taxable sales price of $18,705.

There was a balance due on the BMW of $34,686, resulting in a total due of $54,562. Of this amount, she put down $9,000 in cash and financed $45,562 with Brookline Bank, PO Box 61787, King of Prussia, PA 19406.

53. The 2004 BMW 645CSI was purchased on or about May 20, 2004 in the name of Teeana Griffin, listing a mailing address of 469 Washington Street, Walpole and a residential address of 25 Stow Road, Boston. The purchase price was $72,495, of which she put down $31,000 and financed $45,495 with Chase Manhattan Bank (PO Box 5210, New Hyde Park, NY 11042). Griffin transferred this vehicle to Patrice F. Smith on January 28, 2005, falsely claiming Smith was her sister. On the RMV Form MVU-26, both listed their address as 469 Washington Street.

54. During the wire investigation, Smith has been intercepted indicating that the Mercedes is his. The investigation has also obtained photographs of Anthony Smith with the Bentley at his residence cleaning it and taking his photograph with it. Given the history of purchases and the cost of the vehicle and Smith's drug trafficking activity, I believe there is probable cause to believe that the Bentley is the proceed of drug trafficking activity.

36

55.  I, Joao J. Monteiro, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.  I therefore request that the Court issue the request criminal complaint and arrest warrants, the search warrants, and the seizure warrants.

JOAO J. MONTEIRO
Task Force Agent
Drug Enforcement Adminstration

Sworn and subscribed to before me this __22nd__ day of July, 2005, at Boston, Massachusetts.

CHARLES B. SWARTWOOD, III
CHIEF UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

37