IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION |
| v. | ) | |
| | ) | 05-mj-1703-CBS |
| DONNELLE JOYNER | ) | |
| GERARD KIMBLE | ) | |
| | ) | |

GOVERNMENT'S MOTION FOR RECONSIDERATION FOR PRE-TRIAL
DETENTION UNDER 18 U.S.C. § 3142(f)(1)(C) AND (f)(2)(A)

The government respectfully moves this court to reconsider the denial of the government's motion for pre-trial detention for defendants DONNELLE JOYNER and GERARD KIMBLE. First, the defendants have offered no evidence to rebut the presumption of dangerousness under Section 3142(e). Second, the government herein proffers additional evidence that defendant DONNELLE JOYNER was in the possession of two firearms directly linked to a drug related murder that took place in Boston on September 17, 2004. Third, both defendants JOYNER and KIMBLE have prior felony drug convictions, were involved in the distribution of cocaine and crack cocaine, the possession of firearms, and are each facing at least twenty year mandatory minimum sentences under 21 U.S.C. § 841(b)(1)(A)(ii) and (iii).

I.  Procedural Background

On July 22, 2005, defendants DONNELLE JOYNER ("JOYNER"), GERARD KIMBLE ("KIMBLE") and three other co-defendants (Husie

Joyner, Gregory Bing, and Anthony Smith) were charged in a criminal complaint with conspiracy to distribute cocaine and cocaine base. JOYNER and KIMBLE made their initial appearance before the court on the complaint on July 22, 2005. The government moved for detention pursuant to 18 U.S.C. § 3142(f)(1)(C)(where the maximum term of imprisonment under the CSA is ten years or more) and § 3142(f)(2)(A)(risk of flight). The government further moved for detention for KIMBLE under § 3142(f)(1)(D)(based on two or more prior drug felonies).

On July 28, 2005, the court held a combined preliminary and detention hearing pursuant to Fed. R. Crim. P. 5.1 and 18 U.S.C. § 3142(f). During the hearing, the government offered the testimony of DEA TFA Richard Ridlon. As an exhibit, the court admitted an affidavit of TFA Ridlon in support of probable cause and detention. At the conclusion of the hearing, the court took the matter under advisement.

## II. Factual Background

A.  Defendant Donnelle Joyner

At the July 28, 2005 hearing, the government offered evidence that during intercepted Title III phone calls, Husie Joyner and Gregory Bing talked about DONNELLE JOYNER's possession of two firearms that DONNELLE needed to get rid of. This portion of TFA Ridlon's testimony occurred during re-direct examination following cross examination during which JOYNER's counsel brought

2

out the fact that no weapons were seized during the course of JOYNER's arrest or a search at his residence.[1]

B. More Details Regarding Donnelle Joyner's Possession of Firearms

The intercepted calls about which TFA Ridlon testified contain further details about these firearms and DONNELLE JOYNER's connection to these firearms.

During an intercepted call on April 23, 2005, at 1:01 p.m.,[2] between Gregory Bing and Husie Joyner ("Husie"), Bing told Husie that Donnelle was scared to death. During the first part of the conversation, Bing and Husie talked about how Donnelle was scared about a possible police investigation into the rental car agency from where Donnelle was renting cars. Husie told Bing that he (Husie) told Donnelle that he should go down south because the police were looking at him hard. Investigators then believe that Husie (Donnelle's cousin) indicated that the reason the police were investigating Donnelle was not because of drugs, but because of the murder Kyle Andrews, a.k.a. "K-Low" which took place on September 17, 2004 in Boston. Husie explained that the Donnelle

---

[1] As stated in the affidavit of TFA Monteiro in support of the criminal complaint, the investigation was compromised after wire interceptions revealed that Husie Joyner discovered GPS tracking devices in his vehicle. Thereafter, Husie Joyner fled the District but was arrested in Delaware on July 30, 2005.

[2] A copy of the line-sheet and the audio recording of this phone call, are being made available for defense counsel and the court at the hearing set for August 5, 2005 at 9:15 a.m.

3

needed to get rid of "that thing" and chop it up. In a more hushed tone, Husie then went on to say that "K died." The following is a near verbatim preliminary transcript of the intercepted call between Bing and Husie Joyner. The more relevant portions are bolded and parenthetical comments relating to the context and meaning of the conversations are included:

> Husie: But if they left a number and it's the DEA's number and it's a guy working there [at the rental car agency, Enterprise], Donnelle's ass just should take a big, go down south *** (unintelligible) and let the mothers run they thing *** cuz they on his ass. And I told him, I said if they huntin' you like dat...it might have somethin' to do with **that shit**....that's what I believe...you know what I'm saying
>
> Bing: Yeah
>
> Husie: I say if they lookin' for you, they gonna do it on that street and dat polices is looking for **that thing** [the gun]...I keep telling you things, you know what I'm sayin,
>
> Bing: I told him that, he like nah, nah...
>
> Husie: Yo I said, no no, if this wasn' true, **it's not just about drugs...it's about that motherfuckin, um,** *** [indecipherable code word] **you know what I'm sayin**...
>
> Bing: I asked him, I said cuz the other day **the lady** [K-low's mother] was down by the store nigga, his moms,
>
> Husie: down what store?
>
> Bing: My Ants, nigga! [Anthony Smith's store, the Shoe Fetish at 569 Columbus Avenue]
>
> Husie: What's she doing dere????
>
> Bing: I don't know She says she coming from work...[voices overlap]...she was talking to Donnelle, and I talked to her for a couple of minutes..and that was it
>
> Husie: Yo man I telling you **if somebody mentions that thing,**

yo they want *that thing*, dog, I'm telling you , I'm telling you...**and he can't even turn *that thing* [the gun] in, because, he still gonna go to jail...you know what i'm saying**

Bing: MMM HMM.

Husie: So, **his best bet with that thing, man, is to go chop it up**... [the gun](voices overlap) I'm gonna tell you something right, listen to this, you see how I said **the K-thing** [K-Low, Kyle Andrews]

Bing: Yeah

Husie: *** (something about that K thing) ....**K died, you know what I'm sayin...dat's why they killed**...(phone cuts out) he know nothing about it (hard to understand)

Bing: yo call the house phone dog

Husie: You call my house phone, I don't got the number, call me.

During the early morning hours of September 17, 2004, Kyle Andrews, a.k.a "K-Low" was murdered at his residence at 25 Business Street in Hyde Park, MA. Andrews was murdered by a single gun shot wound from a 31-32 round, most likely from a 32 caliber weapon. No shell cases were recovered indicating there was only one shot fired. The death was ruled a homicide and appeared to be drug related. Following the execution of a search warrant at Andrew's residence the same day as the murder, investigators found large amounts of cash and cocaine. Investigators also found in plain view .38 caliber ammunition and two empty boxes for two .38 caliber revolvers.

Following the arrest of the defendants in this case, one of

the defendants in this case spoke with investigators about this unsolved homicide. This defendant told investigators that DONNELLE JOYNER had possession of two .38 caliber firearms and that one of the .38 caliber firearms was used in the murder of Kyle Andrews.[3]

During a later intercepted call on May 14, 2005 at 1:07 p.m., Husie told Bing about how Donnelle was causing trouble with the guns:

> Husie: I told him, I said man, I said somebody in your side D [Donnelle], I said man, 'cause I don't, like the dudes I fuck with like, older dudes and shit like that. I said somebody in your side man, I'm telling them young niggas man. About he to me and I said Donnelle, **it could be them guns** nigga.
> Bing: Yeah.
> Husie: I said it could be **them fucking guns**. Somebody, I said one of them little bitch ass niggas might say. Donnelle be with them but them niggas won't probably really got **the guns** you know what I'm saying.

C.  Donnelle Joyner's Involvement in "Cooking" Crack Cocaine

During the July 28, 2005 hearing, the government offered evidence concerning a series of intercepted calls on April 22, 2005 during which Husie Joyner (who was in Florida at the time) instructed Bing and Donnelle Joyner to cook (what was weighed out

---

[3] At JOYNER's initial appearance on July 22, 2005, undersigned counsel and TFA Monteiro informed counsel for DONNELLE JOYNER that the government had information that JOYNER knew of the whereabouts of two weapons that may have been used in a murder.

6

to be 992 grams) of cocaine into crack cocaine. Physical surveillance put both Bing and Donnelle Joyner together at Bing's residence minutes before the call. See Affidavit of TFA Ridlon, ¶¶ 30-32. During another intercepted call the next day on April 23, 2005, at 9:21 p.m. Husie Joyner instructed Bing to have Donnelle cook up 265 grams into crack:

> Husie: Yo you already got a rope [ounce] of mine anyways so just throw down a rope [ounce] and a quarter with it, from Donnelle's.
> Bing: But D, D is saying he only got a little left right?
> Husie: Nah I don't need all of Donnelle's, cuz I got a rope [ounce] left of mine,
> Bing: So you want him to do one for you.
> Husie: I don't like the way he [the way Donnelle cooks up the crack] do that shit dog um, Yeah, what House wanted, a Ducie [62 grams]
> Bing: Yeah.
> Husie: That's seven dollars [$7,000]
> Bing: He supposed to have your seven dollars I talked to him already.
> Husie: Alright this what you do. Have Donnelle do it [cook up the crack], right, but listen . . . you watch every dollar of he's doing it you know what I'm saying. Tell him make it come back to um like 265 I don't want it coming back to 275 that too much.
> Bing: Alright.
> Husie: Bing, watch every dollar of him man 'cuz he's a slick dog.

Based on the evidence already adduced at the preliminary hearing, the amount of crack cocaine that is within the scope of DONNELLE JOYNER's conspiratoral agreement exceeds a kilogram of crack cocaine. JOYNER also has a prior felony drug conviction.

7

Therefore, JOYNER potentially faces a mandatory minimum sentence of twenty (20) years.

D.  Defendant Gerard Kimble

At the July 28th hearing, the government introduced evidence that KIMBLE received drugs from Husie Joyner at his residence at 57E Sumner Street in Dorchester. The government also introduced evidence that during the execution of a search warrant at this residence, investigators found a firearm and kilogram wrappings in the kitchen trash bin. TFA Ridlon testified that the kilogram wrappings had been submitted to the DEA laboratory for fingerprint and drug analysis. The firearm, a 45 caliber pistol, was located under KIMBLE's bed and was loaded with 9 rounds of ammunition.

Finally, KIMBLE has a 1998 conviction for Assault and Battery with a Dangerous Weapon and a 1994 felony drug conviction. Accordingly, KIMBLE not only faces a potential twenty (20) year mandatory minimum sentence, but Career Offender status under the Sentencing Guidelines.

III.  Argument and Legal Standard

Under § 3142(e), "[s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officers finds that there is probable cause to believe that the person committed

8

an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act . . . " 18 U.S.C. § 3142(e). The Title 21 drug offense currently charged in the complaint carries a maximum term of incarceration of twenty years. 21 U.S.C. § 841(b)(1)(C). Accordingly, if the court finds probable cause that the defendant committed the offense, the presumption of pretrial detention in § 3142(e) applies.

When this presumption arises, a defendant must produce "some evidence" to rebut this presumption. United States v. Jessup, 757 F.2d 378, 384 (1st Cir.1985). The section 3142(e) presumption is evidentiary and places the burden on the defendant to produce some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community. Id. When a defendant produces such evidence, however, the presumption does not disappear. Dillon 938 F.2d at 1416. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight. Id.; United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir.1987) (per curiam ).

In this case, neither JOYNER nor KIIMBLE have proffered any evidence to rebut the presumption of dangerousness in this case. While the pretrial service interviews demonstrate ties to the community, defendants contact with community is troublesome. In addition to the presumption of dangerousness, both defendants

9

have been involved in the possession of firearms and have prior felony drug convictions. KIMBLE had a loaded .45 caliber handgun under his bed after he had been convicted of Assault and Battery with a Dangerous Weapon in 1998.

The government also proffered evidence that defendant DONNELLE JOYNER was in the possession of two firearms connected to a recent drug related murder in Boston. The government did not provide the court with these particular details due to the ongoing nature of the investigation in this matter and out of a need to protect cooperating sources of information at this stage in the investigation.

Ordinally, under the Bail Reform Act, the reopening of a bail hearing is limited to new information not previously known to the movant that has material bearing on the issue of detention. 18 U.S.C. § 3142(f). Nevertheless, several courts, including the First Circuit, have clearly indicated that this court has discretion to reopen a bail hearing even when the newly proffered evidence was previously known by the government. See United States v. Angiulo, 755 F.2d 969, 972 (1st Cir. 1985)("[i]n the absence of an express statutory reconsideration provision, the magistrate and district court . . . possess inherent power to reconsider previous detention orders . . . "); United States v. Rowe, 2003 WL 21196846, *1 (S.D.N.Y.)(government's oral proffer evidence with more specificity considered by the court despite

fact evidence was known to the government at the time of initial detention hearing). In this case, it is entirely appropriate for the court to consider this newly proffered evidence before the court makes a ruling on defendant JOYNER's conditions of release.

The only point argued by the defendants is the strength of the evidence presented at the preliminary hearing. The argument is myopic because it focuses on a few select words during a handful of intercepted phone calls. The investigation that led to the charges in this case were the result of a lengthy wiretap investigation involving nine different wiretaps and round-the-clock surveillance. The inferences and conclusions (what defense counsel refer to as speculation) of the consistent use of certain words - 125's, dubies, deuces, ropes, etc. - were not based on the listening a single phone call, but were the product of the monitoring of over 20,000 phone calls, the vast majority of which involved drug trafficking, and the training and experience of seasoned law enforcement agents. The fact that this case does not fit the formula whereby a low-level drug dealer is caught red handed does not alter the evidence of thousands of calls where the defendants were caught on tape talking about preparing, cooking, and selling large amounts of crack cocaine.

## Conclusion

For the foregoing reasons, the government submits that the court should reconsider granting defendants conditions of release. Based on the evidence in this case and the defendant's criminal record, there is no condition or combination of conditions that will protect the community.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Neil J. Gallagher, Jr.
Neil J. Gallagher, Jr.
Assistant U.S. Attorney
One Courthouse Way
Boston, MA
(617) 748-3397

Date: August 4, 2005